MODIFIED: FEBRUARY 18, 2021
RENDERED: SEPTEMBER 24, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2017-SC-0258-DG

EDWARD ELDER                                           APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                      CASE NO. 2015-CA-0916-WC
FRANKLIN CIRCUIT COURT NO. 14-CI-00468

KENTUCKY RETIREMENT SYSTEMS                APPELLEE

## OPINION OF THE COURT BY JUSTICE NICKELL

## REVERSING AND REMANDING

Edward Elder appeals the decision of the Kentucky Court of Appeals affirming denial of disability retirement benefits by the Board of Trustees of the Kentucky Retirement Systems (Systems). In a matter of first impression, this appeal addresses the proof required of a public employee with less than sixteen years' service credit[1] to establish his genetic condition—present at conception but dormant until after a dozen years on the job—was not a "pre-existing" condition, disqualifying him from receiving benefits under KRS 61.600(3)(d).[2]

---

[1] Kentucky Revised Statutes (KRS) 61.600(4)(b) exempts a public employee with sixteen years' service credit from proving a disabling condition did not pre-exist employment.

[2] In pertinent part, KRS 61.600(3)(d) establishes a public employee with less than sixteen years' service credit may qualify for disability retirement benefits if objective medical evidence examined by licensed physicians establishes "[t]he incapacity does not result directly or indirectly from bodily injury, mental illness, disease, or condition which pre-existed membership in the system or reemployment, whichever is most recent."

We reverse the Court of Appeals, reaffirm as controlling law the legal principles announced in *Kentucky Retirement Systems v. Brown*, 336 S.W.3d 8 (Ky. 2011), and remand to Systems for appropriate administrative proceedings to correct multiple errors identified in this Opinion.

## FACTUAL BACKGROUND

Elder was hired as a school custodian by the Graves County Board of Education in August 1995. Upon employment, he became a member of the County Employees Retirement System (CERS) which is administered by Systems.[3] Elder worked regularly until 2007, performing heavy activities and receiving glowing evaluations. In 2007, he began accruing health-related absences, particularly due to the onset of chronic nosebleeds and gastrointestinal bleeding. He had previously enjoyed good health.[4]

Dr. Charles Winkler began treating Elder for colon cancer on October 24, 2007. In reviewing notes from Dr. Jeff Carrico, a family practitioner in Mayfield, Kentucky, Dr. Winkler wrote in a letter he had learned Dr. Carrico had diagnosed Elder with Hereditary Hemorrhagic Telangiectasia (HHT) on August 29, 2007. No basis for the diagnosis was provided. We located no notes from Dr. Carrico dated August 29, 2007, but a "patient abstract" of an

---

[3] KRS 61.645(1).

[4] Elder underwent successful back surgery in 1980, began medication for anemia and iron deficiency in 1997, and also received treatment for high blood pressure, an allergic reaction to a bee sting, and sleep apnea.

2

office visit dated August 31, 2007, lists the diagnosis as "HEREDIT HEMORR TELANGIEC."

On September 23, 2008, Elder received a definitive medical diagnosis of HHT from Dr. Chandra Prakash Gyawali, a gastroenterology specialist at the Washington University School of Medicine in St. Louis, Missouri, based on the Curaçao diagnostic criteria.[5]  Even with treatment, Elder's condition continued to deteriorate, ultimately leading him to retire on September 1, 2011, with only 180 months (15 years) total service credit.[6]  His last day of paid employment was May 3, 2011.

Though he experienced a single memorable nosebleed as a young adult,[7] Elder first sought treatment for chronic and severe nosebleeds in 2007.  Pre-2007 medical records submitted by Elder contain no mention of long-term or severe nosebleeds, but erroneously noted he had been diagnosed with HHT in the 1980s.  Elder sought to correct the erroneous historical notations by filing an affidavit to clarify it was his mother who had been diagnosed with HHT in the 1980s, and he testified consistently.  In contrast, Elder's post-2007 medical

---

[5] The Curaçao diagnostic criteria were developed in 1999 and involve four diagnostic factors for the diagnosis of HHT.  A definitive diagnosis of HHT is medically-indicated if three of the four criteria are present.  Dr. Gyawali diagnosed Elder's HHT after establishing the co-existence of recurring and spontaneous epistaxis (nosebleeds), family history of HHT (mother and sister), and gastrointestinal telangiectasia.  The fourth criteria is arteriorvenous malformations (AVMs). *https://curehht.org/understanding-hht/diagnosis-treatment/diagnostic-criteria-hht/*

[6] According to Systems, Elder had not purchased seven summer months and did not earn service credit for October-December 2002 while on medical leave.

[7] Elder recalled his bride became upset when, as a newlywed, he suffered a nosebleed resulting in a bloodstained pillow.

records are replete with references to daily nosebleeds—sometimes five or six a day—along with other associated HHT symptoms. As his nosebleeds and other difficulties worsened, Elder became dependent on regular iron infusions and blood transfusions.

## PROCEDURAL SUMMARY

Without counsel, Elder applied for disability retirement benefits in August 2011. Using Form 6000, Systems' standard application, Elder attributed his disability to the 2007 onset and worsening of the debilitating symptoms of HHT, though he readily admitted the condition's hereditary nature. Under "Members Statement of Disability," Elder copied the following definition of HHT, obtained from the National Center for Biotechnology Information (NCBI) website[8]:

> Hereditary hemorrhagic telangiectasia (Osler-Weber-Rendu disease) is an autosomal dominant, systemic fibrovascular dysplasia in which telangiectases, arteriovenous malformations, and aneurysms may be widely distributed throughout the body vasculature. Major clinical manifestations include: recurrent bleeding from mucosal telangiectases and arteriovenous malformations; hypoxemia, cerebral embolism, and brain abscess due to pulmonary arteriovenous fistulas; high-output congestive heart failure and portosystemic encephalopathy from hepatic arteriovenous malformations; and a variety of neurologic symptoms due to central nervous system angiodysplasia. Therapy is primarily supportive, consisting of iron supplementation and blood transfusion. Septal dermoplasty and oral estrogens may allow prolonged remission of epistaxis, but permanent surgical cure of gastrointestinal bleeding is rarely feasible because of diffuse angiodysplasia of the alimentary tract. Ligation, resection, or embolization may be indicated for pulmonary arteriovenous fistulas. The prognosis and survival of patients with hereditary

---

[8] *https://www.sciencedirect.com/science/article/abs/pii/0002934387901628*

hemorrhagic telangiectasia are favorable, providing treatable complications are accurately diagnosed.

Elder also described how HHT negatively impacted his health and physical abilities. In support of his application, Elder filed more than 2,000 pages of medical records, the earliest dating back to 2005. He had attempted to obtain earlier medical records, particularly pre-employment evaluations, but was told they were unavailable. Though a genetic mutation present at conception, Elder's medical records demonstrated his HHT remained asymptomatic and nondisabling until 2007, when the onset of debilitating symptoms and negative physical impacts forced him to seek medical assessment and treatment.

Agency review began with a Medical Review Panel, comprised of three physicians, unanimously determining Elder was permanently disabled. However, two of the physicians recommended denial of disability retirement benefits due to their conclusion the condition was "pre-existing" because it represented a genetic mutation present at conception. The third physician recommended approval of benefits due to Elder's HHT "causing anemia & requiring treatment," but suggested review after one year.

With assistance of counsel, Elder sought reconsideration. He submitted additional medical records, but still none earlier than 2005. A second Medical Review Panel again found Elder permanently incapacitated. Once more, two physicians determined Elder's HHT was "pre-existing" because it is a genetic disorder present at conception. However, the lone dissenting physician considered the earlier HHT diagnosis of Elder's mother and her warning that he

might have inherited the condition to be medically inconclusive. This physician discounted any diagnostic significance attached to the mother's medical history, noting: the child of a parent with HHT has only a 50% chance of inheriting the disorder; Elder's mother had not exhibited an extreme expression of HHT due to having lived 85 years; and Elder's occasional nosebleeds occurring prior to 2007 had resulted in no significant health concerns, medical interventions, or restrictions on Elder's activities of daily living or employment.

Following the second denial, Elder requested an administrative hearing. Elder was the sole witness, with Systems attending but offering no proof and asking no questions. The Hearing Officer's summary of Elder's testimony reflects he:

> experienced a nose bleed [sic] in 1975 when he got married. Prior to that; he has no memory of nose bleeds. [sic] **He sought medical treatment for nose bleeds [sic] in late August 2007 (Dr. Carrico).** He was having nose bleeds [sic] about five to six times per day, everyday. Clmt was aneamic [sic] at that time in which he had blood transfusions. From August 2007; he began having bleeding of his bowels along w/nose bleeds [sic]. Dr's @ School of Medicine in St. Louis diagnosed the Clmt with HHT. **Clmt became aware of HHT a few years prior because his mother had been diagnosed with the same condition.**
>
> His mother's symptoms were nose bleeds [sic].
> . . .
>
> **Clmt had never sought treatment for HHT prior to 2007.** When Clmt's mother was diagnosed w/HHT; he was not brought in and questionned [sic] nor tested for this medical condition. He was devastated when he found out that he had been diagnosed with HHT. His mother passed away from HHT at the age of 85.

6

(Emphasis added).  The administrative record was closed at the conclusion of the hearing.

On October 8, 2013, the Hearing Officer issued a Recommended Order. Finding Elder's testimony credible, and applying principles set forth in *Brown*, the Hearing Officer recommended approval of disability retirement benefits based on the following:

> [Elder] has less than sixteen years current or prior service in the [Systems] and, as such, has the burden of proving that his incapacity did not result, directly or indirectly from bodily injury, mental illness, or a disease or condition which pre-existed his membership date in the [Systems].  KRS 13B.090(7); *McManus v. Kentucky Retirement Systems*, Ky. App., 124 S.W.3d 454 (2004). **[Elder] has shown that his condition did not pre-exist his membership in the Systems.  Under the standards set forth in *Kentucky Retirement Systems v. Brown*, 336 S.W.3d [8] (Ky. 2011), [Elder's] condition, and his knowledge of said condition, did not sufficiently manifest until he was diagnosed in 2007.**

(Emphasis added).

On October 9, 2013, Systems filed exceptions.  It argued the Hearing Officer's recommendation had not been based on "objective medical evidence," as required by KRS 61.600(3) and defined in KRS 61.510(33).  Instead, Systems asserted the Hearing Officer's recommendation had been erroneously based "solely" on Elder's affidavit.  Thus, Systems urged rejection of the Hearing Officer's recommendation.  Elder filed no exceptions.

On October 18, 2013, Systems sought remand to the Hearing Officer for reconsideration of Elder's claim citing *Kentucky Retirement Systems v. West*, 413 S.W.3d 578 (Ky. 2013), originally rendered on August 19, 2013, but pending in this Court on a petition for rehearing until becoming final on

7

December 9, 2013, when rehearing was denied. Systems argued Elder's claim should be denied because, like West, he had provided no pre-employment medical records demonstrating his disabling condition had not manifested itself prior to employment.

Elder opposed remand. He argued Systems had failed to cite statutory or other legal authority, existent when his claim arose, requiring submission of pre-employment medical records to establish the post-hire manifestation of a disabling genetic condition. In particular, Elder argued remand of his claim for reconsideration in accordance with *West* was inappropriate because *West* had merely applied *Brown*, without changing a claimant's burden of proof.

Despite Elder's objections, on December 26, 2013, Systems remanded the matter, directing the Hearing Officer to reconsider the recommendation consistent with *West*. On January 27, 2014, with submission of no additional proof, the Hearing Officer issued a revised Recommended Order. Once again, Elder was found credible, and it was determined: Elder's only pre-employment medical procedure was a successful back surgery; no pre-employment nosebleeds were attributed to HHT; when he was assessed for headaches and fatigue in 2005, there was no indication of nosebleeds or gastrointestinal bleeding, and HHT was neither mentioned nor treated; and, he worked without interruption from 1995 until 2007 when he was first diagnosed with HHT. At that point, the Hearing Officer diverged from her original recommendation, making new findings and changing her recommendation to a denial of benefits stating:

[Elder] **failed to produce any records which preexisted [sic] his membership date in the Systems** and the condition was objectively discoverable by a reasonable person.  He indisputably suffered from some nose bleeds [sic] prior to his membership in the Systems and he was aware of the condition from his mother who told him he likely had the condition.  [Elder] was symptomatic and aware of HHT, its symptoms and its prevalence in his family.  **With a lack of any medical records prior to his membership** in conjunction with admittedly having nosebleeds and knowing of the likelihood of him having the condition, [Elder] has not met his burden.

(Emphasis added).

Counsel for Elder filed exceptions, emphasizing the record established Elder had suffered few childhood nosebleeds and did not become HHT-symptomatic until 2007.  Accompanying the exceptions was a notice of filing, listing newly-acquired medical records, including:  results from a physical exam performed two months *before* Elder was hired in 1995; a 1999 recertification exam; files from an on-the-job injury in 2002; and pharmacy records from 1998 through 2011.  Counsel asserted the newly-acquired medical records provided additional proof Elder was asymptomatic for HHT until 2007, a dozen years *after* he had become a member of **CERS**.[9]  Counsel further asserted the 2002 exam referenced Elder's mother having HHT, but did not link HHT to Elder.

In its final order, the Disability Appeals Committee of Systems' Board of Trustees granted Systems' motion to strike Elder's newly-acquired medical

---

[9] Not being part of the record certified to us, we cannot verify the content of the proffered files.

9

records because the administrative record had officially closed; denied Elder's exceptions; denied Elder's subsequent motion for rehearing; and adopted as its own the Hearing Officer's revised factual findings and recommendation to deny benefits. In denying Elder's request for rehearing, Systems explained,

> the hearing officer has now rendered a Recommended Order on Remand **based on the totality of the evidence** and **the correct application of the law** to that evidence.

(Emphasis added).

Elder appealed to the Franklin Circuit Court. In affirming Systems' denial of benefits, the circuit court held Systems had reasonably concluded Elder's HHT pre-existed his 1995 employment because

> **Elder did not provide any medical records prior to 2005. The failure to produce medical records does not satisfy the burden of proving the absence of a pre-existing condition.** Because Elder was unable to demonstrate through a preponderance of the evidence an absence of a preexisting [sic] condition, the hearing officer correctly determined that the preexisting [sic] condition precludes Elder from receiving disability retirement benefits under the circumstances.

(Emphasis added). In reaching its decision, the circuit court correctly read *Brown* to hold a claimant bears the burden of persuasion by submitting objective medical evidence proving disability and disproving pre-existence of the disabling condition; that is, demonstrating the disabling condition was neither symptomatic nor "objectively discoverable by a reasonable person" prior to employment. *Brown*, 336 S.W.3d at 14-15. The circuit court also correctly understood *West* to have reaffirmed the claimant's burden of persuasion, while establishing the claimant's burden never shifts to Systems and confirming

10

Systems is not required to counter the claimant's proof. *West*, 413 S.W.3d at 581 (citing KRS 13B.090(7)). However, the circuit court further read *West* to require submission of pre-employment medical records to prove a disabling condition was asymptomatic and reasonably undiscoverable prior to hiring. Thus, because, like West, Elder had submitted no pre-employment medical records, the circuit court found he had failed to meet his burden of proving the legal compensability of his disabling genetic condition.

On appeal, a divided panel[10] of the Court of Appeals affirmed the circuit court's reading of *West* and its denial of Elder's claim for disability retirement benefits. In particular, the Court of Appeals affirmed the circuit court's understanding that pre-employment medical records are required to meet a claimant's burden of proof under KRS 61.600. The Court of Appeals held Elder had "misperceived" his burden as requiring that he only show the lack of symptoms and the lack of an HHT medical diagnosis prior to his 1995 employment; and, citing *West*, noted pre-employment medical records could be determinative in establishing whether his condition was, in fact, asymptomatic and reasonably undiscoverable at the time of his hiring. Moreover, the Court of Appeals expressed doubt regarding the non-existence of any pre-employment medical records, ignoring Elder's failed attempts to obtain and submit such records in support of his application.

---

[10] At page 19 of its brief, Systems asserts, "[t]his Honorable Court should not disturb the unanimous, well-reasoned decisions of the Agency and the lower courts." However, the Court of Appeals' decision in this case was not unanimous. One judge dissented without writing and the third concurred in result only.

11

## STANDARD OF REVIEW

We abated consideration of Elder's motion for discretionary review pending resolution of *Kentucky Retirement Systems v. Ashcraft*, 559 S.W.3d 812 (Ky. 2018), and *Bradley v. Kentucky Retirement Systems*, 567 S.W.3d 114 (Ky. 2018). In those cases, this Court addressed sufficiency of proof issues related to the quality, credibility, or consistency of evidence submitted by the claimants, while endorsing *McManus* as the applicable standard for analyzing Systems' denial of a disability retirement benefits claim. We granted review following endorsement of finality in *Ashcraft* and *Bradley*.

This Court applied the compelling evidence standard in reviewing the sufficiency of proof issues raised in *Ashcraft* and *Bradley*. Elder's appeal, however, raises a distinct legal issue. Here, Elder challenges Systems' interpretation and application of our holding in *West* as requiring claimants with less than sixteen years' service credit to submit pre-employment medical records—to disprove the pre-existence of a genetic condition. As with all pure questions of law, our standard of review is de novo. *Smith v. Fletcher*, 613 S.W.3d 18 (Ky. 2020).

## LEGAL ANALYSIS

Initially, from a legal perspective, a genetic disorder is *not* "pre-existing" merely because it is medically present at conception. Consistent with KRS 61.600(3)(d), a genetic condition existent at conception is legally "pre-existing" *only if* symptomatic and "objectively discoverable by a reasonable person" prior

12

to employment. *Brown*, 336 S.W.3d at 15. As noted in *Brown*, any other understanding would be "absurd" and "contrary" to legislative intent. *Id.*

However, a majority of physicians comprising two separate Medical Review Panels erroneously concluded Elder should be denied disability retirement benefits simply because his disabling condition was a genetic disorder—that is, inherited and scientifically existent at conception. While these physicians may have been correct from a medical standpoint, their conclusions were contrary to the legal mandates announced in *Brown*. Therefore, the conclusions drawn by the majority of each of the Medical Review Panels were clearly based on the wrong legal standard.

Disability retirement benefits awarded under KRS 61.600 are intended "to provide security for those who are unable to continue working until normal retirement age due to injury or disease." *Roland v. Kentucky Retirement Systems*, 52 S.W.3d 579, 583 (Ky. App. 2000) (citing *Maybury v. Coyne*, 312 S.W.2d 455 (Ky. 1958)). KRS 446.080(1) mandates "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature[.]" Regarding statutory construction and interpretation, this Court has held "[a]ll presumptions will be indulged in favor of those for whose protection the enactment was made." *Livingood v. Transfreight, LLC*, 467 S.W.3d 249, 256 (Ky. 2015) (citing *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 732 (Ky. 1983)).

As this Court unanimously wrote in *Brown*,

13

we do not believe it was the intent of the legislature to define as "pre-existing" those diseases and illnesses which lie dormant and are asymptomatic such that no reasonable person would have realized or known of their existence. This is particularly so given the fact that some diseases are genetic and may not surface for many years.

336 S.W.3d at 15. Elder was born with HHT, a latent genetic disorder making him susceptible to symptoms which did not awaken for decades according to Dr. Winkler. This conclusion is entirely consistent with the Hearing Officer's original findings in correctly applying *Brown*, which remains controlling case law. In interpreting KRS 61.600, we recognized,

> [i]ndeed, were we to analyze whether a genetic condition pre-exists membership in the Kentucky Retirement Systems, our conclusion would always be "yes" given the fact that our genes are composed long before employment. However, our common sense approach guides us in the opposite direction and once again aligns this Court with the maxim that courts should construe a statute according to its plain meaning, unless that meaning leads to an absurd result which is contrary to the intent of our legislative authority. *Johnson v. Branch Banking & Trust Co.*, 313 S.W.3d 557, 559 (Ky. 2010). To allow the Kentucky Retirement Systems to deny disability retirement benefits based on the notion that a genetic disease, rooted in one's DNA, is pre-existing regardless of whether that disease is symptomatic prior to enrollment certainly qualifies as an absurd conclusion and would clearly defy the legislative intent of KRS 61.600.

> We believe it the intent of our legislative authority to preclude from benefits those individuals who suffer from symptomatic diseases which are objectively discoverable by a reasonable person. We do not believe it the intent of the legislature in drafting KRS 61.600 to deny benefits to those individuals who suffer from unknown, dormant, asymptomatic diseases at the time of their employment, ailments which lie deep within our genetic make-up, some of which may not yet be known to exist. Rather, we believe the legislature intended to deny benefits to individuals whose diseases are symptomatic and thus were known or reasonably discoverable. Why else would the legislature have referred to "objective medical evidence" in KRS 61.600(3)? *See* KRS 446.015 ("All bills . . . shall

14

be written in nontechnical language and in a clear and coherent manner using words with common and everyday meaning.").

*Brown,* 336 S.W.3d at 15. We did not retreat from this position in *West,* and we reaffirm *Brown* today.

The narrow question in this appeal is whether Elder's HHT was "asymptomatic such that no reasonable person would have realized or known of [its] existence" when he was hired in August 1995. *Id.* Our analysis draws heavily on *Brown,* but we are mindful of *West.* *Brown* held: the appellate standard of review for Systems' denial of a benefits claim is "whether the evidence in the [claimant's] favor is so compelling that no reasonable person could have failed to be persuaded by it," *id.* at 14-15 (quoting *McManus,* 124 S.W.3d at 458); KRS 61.600 benefits are unavailable for "symptomatic diseases which are objectively discoverable by a reasonable person" at the time of her hiring, *id.* at 15; a member satisfies her burden by proving her disabling condition did not pre-exist her employment, *id.* at 16; and, smoking is a "behavior" not a "condition." *Id.*

Building on *Brown's* approval of a claim, in *West* we affirmed denial of benefits to a man who admitted he smoked long before being hired but failed to prove his COPD[11] developed after he began working at a municipal water treatment facility. *West* serves three limited purposes. First, it reaffirms *Brown's* directive that a claimant seeking disability benefits under KRS

---

[11] Chronic obstructive pulmonary disease.

61.600(3)(d) must prove his disabling condition was asymptomatic and not objectively discoverable by a reasonable person when he was hired. *Brown*, 336 S.W.3d at 15. *West* affirms, based on a "plain reading" of KRS 13B.090(7), the claimant bears the burden of proof alone and must prove his claim by a preponderance of evidence. *Brown*, 336 S.W.3d at 14-15; *West*, 413 S.W.3d at 580-81. Second, *West* corrects the Court of Appeals' misunderstanding about burden shifting. Based on KRS 13B.090(7) and KRS 61.600, *West* establishes the burden never shifts to Systems in a retirement disability benefits claim. *West*, 413 S.W.3d at 581. Third and finally, contrary to the Court of Appeals' understanding, *West* holds Systems: "may choose not to challenge evidence it deems unconvincing[;]" whether the claimant meets his burden is independent of whether Systems introduces any proof; and, the Hearing Officer may reject uncontested proof. *Id.* These three points are the full extent of any "clarification" to be gleaned from *West.*

Here, Systems, the Franklin Circuit Court, and the Court of Appeals read *West* as requiring denial of Elder's claim because he submitted no pre-employment medical records to disprove the pre-existence of HHT. However, our holding in *West* imposed no such requirement, and the facts of *West* are clearly distinguishable from those presented in Elder's claim.

In *West*, the claimant alleged his non-genetic disabling condition, COPD, had not manifested in 1991 when he was hired, and claimed his symptoms did not become problematic until about two years immediately preceding his 2005 retirement. Contrary to his statements, however, medical records indicated

16

West had been diagnosed with COPD as early as 1998. Moreover, all examining physicians agreed West's COPD was directly caused by his tobacco use, and West admitted he had smoked at least three packs a day for 12 years prior to his employment. Pre-employment medical records might have been dispositive of West's claim, but all his pre-1998 medical records had been destroyed. The scant and conflicting proof—including the unfortunate unavailability of any pre-employment medical records—led our Court to conclude there was "simply no way to determine whether West suffered from some level of COPD in 1991." *West*, 413 S.W.3d at 582.

Denial of West's claim due to his failure to submit pre-employment medical records should not be interpreted to mean every claim unsupported by similar health records must be denied. Medical records predating employment can be dispositive of many disability retirement claims, but not all. Post-employment medical records can also offer compelling proof to disprove pre-existence of a disabling condition as required by KRS 61.600(3)(b). Absence or inclusion of symptoms or treatment reported in any medical record—pre-hire or post-employment—may be probative. As in *West*, and in this case, a claimant's pre-employment medical records may not always be available—assuming, of course, the claimant has had access to regular medical care—and claimants should not be precluded from submitting other medical proof deemed equally convincing. Thus, we reject Systems' argument that *West* requires a member to submit "medical records dated prior to and

17

immediately subsequent to the disability retirement claimant's membership and/or expert testimony explaining the onset of a condition[.]"

The Court of Appeals correctly stressed pre-employment medical records can be helpful in excluding the pre-existence of a disabling condition by demonstrating lack of treatment, or by establishing an alternative medical cause for nonspecific symptoms. The Court of Appeals erred, however, in reading *West* to require pre-employment medical records in every case.

The facts presented in *Brown* are much more akin to those presented in Elder's claim. As acknowledged in *West*,

> Brown offered a "plethora of evidence" that, while her smoking habit pre-existed her membership in the Systems, her COPD did not. *Brown,* 336 S.W.3d at 11. **Medical records indicated that she showed no signs of COPD during an evaluation conducted one year after her employment date. Further, a medical expert opined that onset occurred approximately four years after her membership date. Finally, she presented medical records demonstrating that her first firm diagnosis of COPD occurred nine years after her membership date.**

*West*, 413 S.W.3d at 582 (emphasis added). Though precluded from offering newly-obtained pre-employment medical records on remand, Elder had already submitted extensive post-employment medical records, in addition to his affidavit and testimony, cumulatively disclosing: Elder enjoyed good health, with no symptoms or work interruptions until 2007 when he developed chronic nosebleeds or other HHT symptoms; Elder was treated for various ailments between 2005 and 2007 with no recorded history or complaints of nosebleeds or other HHT symptoms; Elder's first definitive diagnosis for HHT—based on the Curaçao criteria—came in 2008 from Dr. Gyawali, a medical specialist to

18

whom he had been referred; and, an earlier diagnosis of Elder's mother with HHT in the 1980s was deemed to be inconclusive regarding whether he had inherited the disorder because he remained asymptomatic until 2007, his mother lived to age 85 with no extreme expression of HHT, the child of an HHT parent has only a 50% chance of inheriting the disorder, and, not all of Elder's siblings were diagnosed with the disorder.

In particular, Dr. Winkler indicated the most common symptom of HHT is recurring nosebleeds. He also verified the 2007 onset of Elder's HHT symptoms. In a letter, dated February 2, 2012, Dr. Winkler wrote

> Mr. Elder does have hereditary bleeding disorder, namely [HHT] which apparently was relatively asymptomatic before he presented to Dr. Carrico in 2007. From 1995 to 2007 the patient continued his duties at Graves County School System apparently uninterrupted. From 2007 forward he continued to work while being treated for this chronic medical condition.

While not in the form of an affidavit, deposition, or hearing testimony, Dr. Winkler's letter and medical notations are consistent with Elder's other medical proof and testimony. Taken as a whole, the evidence submitted by Elder transcends Systems' additional criticism that his claim should also be denied because he "provided no medical expert opinion on when his HHT onset."

Though Elder was not permitted to file more-recently obtained pre-employment medical records on remand, the Hearing Officer's original recommendation—correctly based on *Brown*—found the foregoing post-employment medical proof, alone, established Elder's disabling HHT had remained asymptomatic and reasonably undiscoverable until 2007, thereby allowing an award of disability retirement benefits. Contrary to Systems'

criticism, Elder was not required to submit his own contemporaneous medical records to prove it was his mother, and not himself, who had been diagnosed with HHT in the 1980s. His affidavit and testimony, along with a reasoned reading of his post-employment medical records, was sufficient to allow the Hearing Officer to make an informed determination.

As with many symptoms, occasional nosebleeds—as opposed to recurring nosebleeds which Dr. Winkler identified as the most common indicator of HHT—are nonspecific, arising due to diverse medical conditions or trauma, and typically do not cause a reasonable person to suspect the onset of a rare and severe genetic condition. During the course of his fifteen-year employment, Elder was seen by numerous physicians, but remained undiagnosed as having HHT until 2007-2008.[12] If medical professionals did not immediately, or more quickly, suspect and uncover Elder's unique genetic condition, it would certainly be unreasonable to expect a medically-untrained person to self-diagnose.[13] Based on the foregoing, any denial of Elder's claim would require a compelling explanation as to how his HHT was "objectively discoverable by a reasonable person." *Brown*, 336 S.W.3d at 14-15.

---

[12] We cannot confirm when the HHT diagnosis actually occurred. References to the condition begin with Dr. Carrico's patient abstract in August 2007, but the first definitive diagnosis of which we are aware was made by Dr. Gyawali in 2008.

[13] Difficulty in medically diagnosing HHT is not surprising given that many of its symptoms "disguise as anemia, migraine, asthma, stroke, congestive heart failure, or liver cirrhosis." Notably, before being diagnosed with HHT, Elder was treated for anemia, iron deficiency, hypertension and sleep apnea. As a result of HHT mimicking other conditions, diagnosis of HHT may be delayed for decades, causing many to call it "the Great Masquerader." *See generally, https://curehht.org/understanding-hht/*

20

Finally, because we have held *West* did not replace the law established in *Brown* regarding the burden of proof under KRS 13B.090(7), we also hold Systems erred in remanding the Hearing Officer's original recommendation for reconsideration. KRS 13B.150(2)(d). Moreover, if *West* had been "on point" by requiring pre-employment medical records—as Systems incorrectly asserted—Systems abused its discretion in denying Elder an opportunity to procure and present additional medical proof to meet the altered evidentiary requirements. *Id.*

Systems created an impossible scenario. When Elder's claim was filed, *Brown* was controlling caselaw. Elder submitted proof consistent with *Brown*, the administrative record was closed, and the Hearing Officer recommended an award. Thereafter, *West* was rendered. Systems misinterpreted *West*, and before it became final, sought rehearing of Elder's claim based on that misinterpretation. When Elder's claim was remanded to the Hearing Officer for reconsideration based on Systems' misinterpretation of *West*, Elder was denied any opportunity to file additional proof, even though he had acquired pre-employment medical records in support of his claim. As a result, in presenting proof to support his claim based on controlling statutory and legal authority, Elder could not have foreseen any change in the standard of proof purportedly resulting from *West*. In short, Systems misinterpreted the import of *West*, incorrectly ordered remand based on its mistaken belief, and compounded its error by refusing to reopen proof to allow Elder a fair opportunity to submit the

21

very type of pre-employment medical records it erroneously maintained *West* now requires. The equities of Elder's claim are compelling and overcome the need for finality. *Bishir v. Bishir*, 698 S.W.2d 823, 826 (Ky. 1985), *overruled on other grounds by Smith v. McGill*, 556 S.W.3d 552 (Ky. 2018).

## CONCLUSION

Systems, the circuit court, and the Court of Appeals misinterpreted our holding in *West*, leading to a cascade of multiple errors. In this appeal, the lack of proper consideration of Elder's medical evidence by two Medical Review Panels was merely the first in a series of missteps attributable to Systems and those acting at its direction. Each error was arbitrary, capricious, and an abuse of discretion under KRS 13B.150(2)(d). Any of those instances, standing alone, would require reversal and remand. On remand, returning this matter to a Medical Review Panel where the initial error occurred is required. Additionally, Elder shall be permitted to submit any additional medical records, if desired.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Donna Thornton-Green
Law Offices of Donna Thornton-Green

COUNSEL FOR APPELLEE:

Anne Caroline Bass
Kentucky Retirement Systems

22

# Supreme Court of Kentucky

### 2017-SC-000258-D

EDWARD ELDER                                                    APPELLANT

ON REVIEW FROM COURT OF APPEALS
CASE NO-2015-CA-000916-WC
V.          FRANKLIN CIRCUIT COURT No.14-CI-00468

KENTUCKY RETIREMENT SYSTEMS                    APPELLEES

## **ORDER GRANTING EXTENSION**

The Petition for Extension, filed by Appellee Kentucky Retirement Systems, of the Opinion of the Court, rendered September 24, 2020 is hereby granted and the attached opinion is substituted.

All sitting.  All concur.

ENTERED: February 18, 2021.

_____
CHIEF JUSTICE

23